Please be seated. We have one case scheduled for this afternoon. Madam Clerk, would you call the case just to make sure we have the right folks? Case number 20-3011 from the Southern District of Iowa, Brad Erdahl v. Ken Pirc, et al. All right, Ms. Donalds. Please proceed. May it please the Court, good afternoon. My name is Jessica Donalds and I am here on behalf of Mr. Brad Erdahl, an inmate at the Iowa State Penitentiary in Fort Madison, who sought permission from the defendants to form a Soto Zen religious group and was denied permission to do so within the prison. This appeal is about whether the District Court improvidently granted the defendants' motion for summary judgment where the record demonstrated ample disputed facts as to why Mr. Erdahl needed a Soto Zen religious group and why his request was denied. Basically, the District Court and the defendants both failed to comprehend the differences between what was on offer in the prison's ecumenical Buddhist group and what Mr. Erdahl was asking for. This failure is what led the District Court to wrongly conclude that denying Mr. Erdahl permission to form a Soto Zen religious group did not substantially burden his religious activities. Counsel, what does the record show us was not provided that needed to be provided to comply with federal law? Below there was some dispute about certain objects that he was denied or granted permission to have. This appeal is not about whether those objects should or should not have been granted to him. Mr. Erdahl recognizes the record shows he was granted all the objects he would need to practice Soto Zen if he had chapel time at the Iowa State Penitentiary. But what was not given to him and what he needed to practice his religion was permission to form a Soto Zen religious group and to have chapel time for Soto Zen services. What's the significance, and I didn't appreciate this the first time I looked at the case, of the fact that there are separate rooms in the chapel? So there's the main chapel and then there's apparently three additional rooms where, you know, the different sects of Buddhism can sort of break out and have their own individual time. Is that significant in your view? It is. Under the Religious Land Use Institutionalized Persons Act, the Congress has made it clear that a religious exercise can only be denied if denying it's the least restrictive means of furthering a compelling interest. But with three rooms at the chapel where Mr. — the Buddhist group could be practicing in their room and Soto Zen, which is admittedly a denomination of Buddhism, could also have their own breakout time and practice their traditions. Could he have not — Demonstrates that — excuse me, I apologize. No, no, I was just — my understanding is he could have, and I didn't mean to interrupt you, but he could have, during the regular Buddhist time, taken one of those rooms and used some of the objects that were given. And I'm sorry I'm not using more specific language because I just don't — I'm not a Buddhist expert. But he could have used that as part of the general Buddhist group. Am I wrong about that? I'm not an expert either, just to stress. But my understanding from the record was that without permission to form the Soto Zen group, he could have had breakout time in one of these chapels possibly, but it wouldn't be on the level where he could have Soto Zen services, where he could have Soto Zen holidays. It wouldn't be the same as being recognized as a religion. It would essentially be a study group. Okay. What's your best authority on the requirement of the government here to provide the separate group opportunity that you seek? That would be Murphy v. Missouri Department of Corrections, 372 F. 3rd 979, an Eighth Circuit case from 2004. Mr. Murphy was an inmate in Missouri who sought permission to form a Christian fundamentalist separatist religious group within the Missouri Department of Corrections, and he brought claims under the First Amendment and the Religious Land Use Institutionalized Persons Act. His First Amendment claim failed under rational basis, but this court remanded his claim under the RLUIPA. It stated that the district court improperly concluded that Murphy's religion was not substantially burdened and that group worship and group discussion and study cannot be said to be tenets or beliefs central to his religion. Basically, Mr. Murphy was granted solo practitioner status for his fundamentalist separatist Christian group, but he wasn't allowed to worship in a group because he didn't have group status. There were a lot of security concerns with Mr. Murphy's group. It was a white supremacist Christian group, and frankly, the MDOC did have a compelling interest in controlling how that group met. However, under strict scrutiny analysis, they had to do more than just assert a security concern. They had to show that there was no way that the group could meet safely, and the court just couldn't hold that group practice was not a relevant part of Mr. Murphy's religion. What weight, if any, is to be given to, I guess it's Reverend Redding's views, that there's no burden on Mr. Erdahl's practice here, and she's the local provider for Zen services? Reverend Redding is certainly the expert in Buddhism and Zen services in this case, but she's not the expert in whether Mr. Erdahl's First Amendment or RLUIPA rights are violated. The record demonstrates that Reverend Redding initially supported Mr. Erdahl's efforts to form this group so that the Soto Zen group could control its own funds and practices within the Iowa State Penitentiary. It was only after meeting with the prison officials, when the prison officials began raising security concerns, that Reverend Redding instead encouraged Mr. Erdahl to practice interfaith cooperatively with the other Buddhist groups, with the other Buddhist inmates at the penitentiary. So, I mean, while she is the expert in what Mr. Erdahl might need spiritually, she's not the expert in whether being forced to remain with the Buddhist group and not have his own group is a violation of his First Amendment rights or his rights under the RLUIPA. Let me follow up on something the Chief asked, which is on Redding, my understanding is she's a priestess in the particular type of Buddhism that Mr. Erdahl wants to practice, right? So it was Soto Zen Buddhism, is that right? Yes, Soto Zen is sometimes called Zen Buddhism interchangeably, and Reverend Redding is a Soto Zen priestess. Okay, so then we have this case, and I want to ask you about it, Weir v. Nix. And it says that basically there's only really a substantial burden when you're forced to pray with somebody who has beliefs significantly different from your own. And here we sort of have the opposite situation. We have somebody who Erdahl is trying to pray with alone or in part of a separate group, but who completely shares his belief. So how does Weir sort of, you know, apply in this case, if at all? I think that Weir is still instructive here. In the Iowa State, in the Iowa Department of Corrections, for example, we recognize three Christian groups, four groups that are based on various parts of Judaism, and four groups that are based on Islam. And frankly, there's a lot of similarities between Catholicism and Protestantism, and frankly, between those two and Jehovah's Witnesses and Messianic Jews. All of these religions believe that Jesus Christ died for their sins. All of these religions follow the same primary text, although there's different interpretations. It's easy for us to distinguish between these religions because we're familiar with them in the United States. We grew up in that context. And these religions are all entitled to separate religious group recognition within the Iowa Department of Corrections. There are similar fundamental distinctions between these religions, between Soto Zen and ecumenical Buddhism. What it appears from the record is that Mr. Erdahl just did a poor job explaining it because he wasn't an expert, and the religious, the officials at the Iowa Department of Corrections who were in charge of determining whether he got to practice didn't understand what he was saying. But the information establishing the fundamental differences is in the record. Did the government offer a pineological reason for the denial of the request? Yes. The explanation that Mr. Erdahl was given prior to the litigation starting was that we would not have two Buddhist groups at one facility. As litigation commenced, this has evolved into a security explanation stating that other inmates would believe this was not fair treatment if there were two Buddhist groups. However, under the RLU-IPA, this Court cannot just blindly accept the security justifications. They have to examine them and question them. Alone be a state of shabazz, Holt v. Hobbs are instructive of the level of questioning that this Court should do in determining whether these pineological justifications are legitimate. I mean, as Justice Strauss already pointed out, there was three rooms at the chapel that are already supervised by one security officer within the prison. If multiple groups can meet at the same time, for example, the Judaism-based groups all meet at the same time. The Islam-based groups generally meet at the same time. Why can't Buddhists and Soto Zen meet at the same time in separate rooms? The pineological justifications do not hold up in this case under the RLU-IPA. Does the record reflect how many people want to participate in his group? Mr. Erdahl was the only one. I see my time is about to expire. Can I finish your question? Yes. Mr. Erdahl was the only one who signed his name to the religious request form. There is a suggestion in the record that there were two inmates who would have joined him in the Soto Zen group. Thank you. Thank you, Ms. Donnells. Ms. Wallace? May I proceed? Yes. Good afternoon. My name is Lorraine Wallace. I'm an assistant attorney general for the state of Iowa. I represent the four prison officials in this case. Ken Pierce, who is the statewide religious coordinator. Mike Sherbrock, who was at all times the treatment director at the Iowa State Penitentiary. He is now retired. Chaplain Marmore, who was at all relevant times the chaplain at the Iowa State Penitentiary. I would just note that this is not included in my materials, but Chaplain Marmore, I believe just this past summer, has now retired. And Katrina Carter, who at all relevant times was the chairperson of the statewide religious review committee. As you know, this is a case under the First Amendment and RLUIPA with regard to Mr. Erdl's Zen Buddhism practices and faith. The crux of this case is that Mr. Erdl failed to provide evidence and show that the prison officials imposed a substantial burden on his religious practices. Well, if I understand the argument made this morning, or excuse me, this afternoon, the point is that he wanted to be able to associate with others in a separate meeting. And that it's that accommodation of having the ability to, in essence, form a separate group that is his contention of a deprivation. He's no longer disputing the provision of certain materials. Correct, Your Honor. But what he didn't show, he was already and always has been provided a time to practice his Zen Buddhism faith. But is he now being told others cannot participate with him in his time? No, you misunderstand. The record is void of evidence as to how many Buddhist, and let alone Zen Buddhists, were practicing in February of 2018 when this case began. What we do know is that the priestess, Priestess Redding, who advised the Iowa Department of Corrections across the entire state of setting up the Buddhist practices, is a Zen Buddhist, the same denomination of Buddhism that Mr. Erdahl is. She was the one and only priestess of any Buddhist denomination that ever came into the Iowa State Penitentiary and did the services and guided the men in the Buddhist religion. We don't know, because the record is void of this, but how many, number one, Buddhists actually were going to services and study group at that time, but, and we don't know how many of those were Zen, but I would presume they were, there was, but we do know they were guided by a Zen practitioner. And Mr. Erdahl, for whatever reason, got it in his head that he didn't want to practice with whoever those men were, whether they be Zen or others. So are you saying his dispute with their presence was not a religious dispute but a personal animosity? I'm saying it's possible. I'm saying the record is void on that. But what we do know is that the record does show that Priestess Redding and all of the congregate items that were in the Buddhist box in the Iowa State Penitentiary were the Zen Buddhists, were already there. But what does the record show as the government's basis for denying the request that was specifically made? He was already being provided a time that Priestess Redding said provided for all of his Zen Buddhist needs. He was not, that Zen Buddhism, she told the government officials that Buddhism, he didn't need just to have his own time slot. That even if there were other men of other denominations of the Buddhist faith in the room, she said that did not substantially burden him. He could practice and did, had all of the things necessary to practice his Zen Buddhism faith. So... Could he go into those other rooms? Is that established by the record? The record did not establish that either. The record does establish that the chapel does have three rooms. However, at the time that this started, as the record established, that there were 16 religions on the schedule. And because of the Tier 1, Tier 2 system, we had to provide 32 different time slots for 32 different groups on the chapel schedule to practice their faith. In the, there was not enough space. The Buddhism group was in one room, but the other three rooms, contrary to judge, what I think you were assuming from the record. It is my assumption, and it's not in the record. Okay. But I believe in, with my clients that the, when the Buddhists had their time in the, they were in one of the rooms, and the other two rooms were occupied by other faiths. I see. So it's not as if, it's not as if when the Buddhists have the chapel, they also have all the adjoining rooms as well to use and to break out and to... Correct. Okay. That's helpful. Correct. Furthermore, I just want to say in response to a comment that my opponent made that there is no, the record does not support the statement and the conclusion that my opponent said in the, that it was only after Priestess Redding talked to prison officials that, oh, she changed her mind on this. There is no, there is no, there is nothing in the record to support that. In fact, there is in the record, and you can find it in the e-mails, which are in the appendix, the e-mail chains, that Mr. Erdahl in the first part of this had apparently, so he says in his e-mails, communication with Priestess Redding, and she, I assume because she was talking to the other Buddhist adherents, Zen Buddhists as otherwise, was fearful of Mr. Erdahl's, the ruckus he was rising and that the other men were not happy. So I just wanted to say that I take issue with it was only after the prison officials talked to Priestess Redding. That's not supported by the record. How about Pierce's response that we will not have two separate Buddhist religious groups at one facility... Right. ...when at the same time there are multiple Christian Jewish groups? Your Honor, let me bring to your attention that there's more groups, there's different Lutherans, Methodists, Baptists, you know, in that, in the Protestant group. In the Native American group, there's literally 500 tribes across the, in excess of 500 tribes across the nation that have different practices of, so there is more, while we have different Islamic groups, there is, their leaders are saying no. They are, they are completely a different thing. Whereas in this case, Priestess Redding is saying, no, there, we commonly practice, in Zen Buddhism, we commonly, we aren't exclusive. We have other denominations come in and it's, it's not a problem. It is, in fact, our way. Just like in the Native American faith, it is their way to have the Lakotas, all of them, you know, sweat. So you're saying there's a, there's a type of ecumenism that's built into... Yes. ...Zen Buddhism? Yes. And, and that is what, you know, Priestess Redding advised the prison staff. I'm sorry, Your Honor, I'm out of my, out of time. All right. Thank you. Thank you, Ms. Wallace. Ms. Donalds, I think you used up pretty much all your time, but we'll give you a minute to reply. Thank you, Justice Smith. I'll be brief. I do want to point out the parts of the record that indicate that Reverend Redding did initially support the formation of a Soto Zen group and then changed her mind after meeting with the prison officials. In the record at Appendix 129, a February 15, 2018, email or communication between Reverend Redding and my client indicates that she supported the formation of the group so that the Soto Zen group could control its funds and its practice. On March 14, 2018, Ms. Redding and Mr. Erdahl met with the prison officials and Mr. Erdahl was denied permission to form the group. And on March 28, 2018, Ms. Redding does write again to Mr. Erdahl expressing her changed opinion after talking to the prison officials. That's at Appendix 131 in the record. Counsel, is there anything in the record to indicate that the plaintiff's rationale for seeking a separate group had to do with personal reasons between him and the other adherents versus some religious conviction? No, Your Honor. The record indicates it's a religious conviction based on his communications with Reverend Redding and his submissions to the prison officials. Thank you. The Court wishes to thank both counsel for the argument you provided to us this afternoon and the briefing which has been submitted to us. We will take the case for an advisement. And Ms. Donnells, we appreciate your serving as appointed counsel for the appellant in this case. And just for future reference, Court of Appeals,